## Walbert, Appellant, *v.* Farina.

Argued June 6, 1963. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

Charles H. Weidner, with him David J. Batdorf, and Stevens & Lee, for appellant.

George R. Eves, for appellee.

OPINION BY MR. JUSTICE MUSMANNO, July 2, 1963:

Robert R. Walbert was killed as the result of an accident which occurred on December 1, 1957, when his car was struck by a car being driven by Jerome Farina. Mrs. Esther E. Walbert, his widow, as administratrix of his estate, brought actions of trespass against Farina under the Death and Survival Acts of Pennsylvania. The jury returned a verdict in the sum of $1500 for the plaintiff in the survival action and $2762.23 in the death action, this latter amount being merely the total of medical, hospital and funeral bills. The plaintiff moved for a new trial averring inadequacy of verdict. The trial court refused the motion and the plaintiff appealed to the Superior Court which affirmed the refusal of a new trial. A petition for allocatur followed and we allowed appeal to this Court.

If the defendant Jerome Farina was responsible for the collision which snuffed out the life of Robert Walbert, it would seem, by the slightest glance at the total verdict, that it does not represent an amount consonant with the value of a man's life, especially one who was only 49 when killed. The decedent was employed as an erector at the Textile Machine Works, working both at the local plant in Reading, and away from home on various assignments and missions for his company. His earnings for 1957, up to the date of his death, were $5923.47, plus $868.50 for hotel and travel expenses.

In 1956 his earnings amounted to $8,060.17, plus $945 for out-of-town expenses.

Robert Walbert had a life expectancy at the time of his death of 23.36 years. He was in excellent health and there appeared no reason why he could not remain at his job until he attained the age of 65. To allow in a profitable prospectus of that character only $500 per year for only three years is shocking, if one regards verdicts as being compensatory for losses sustained. To deny the widow any amount for the loss of wages between the date of her husband's death and the time of trial and for no future loss of anticipatible future earnings is also unacceptable arithmetic on the blackboard of justice, if the defendant was responsible for the death of Robert Walbert.

When a jury conscientiously concludes that a defendant has no excuse for doing what he did in truncating the life of another, it may not, by extra-juridical reasoning or by wandering off into the realms of whimsy and neighborhood philosophy, withhold from the plaintiff what, by its verdict, it has decided he is entitled to have, namely, full compensation for his losses.

It would appear that the decedent, a day or two before the accident, had removed some of his clothes from the marital home to another address in Reading where he had rented two rooms. The lower court, in refusing a new trial, rhetorically asked the questions: "Were Mr. and Mrs. Walbert actually living together as husband and wife, were they separated, or were they about to separate? Could the jury have asked the question of why the plaintiff left the decedent from Friday until Sunday afternoon, when both were not working?"[1]

---

[1] Since the decedent was in a moribund state from 4:15 Sunday morning it is not clear what adverse conclusion the trial court intended to draw by stating that he did not call on his wife Sunday afternoon.

The Superior Court, in affirming the action of the trial court, said: "The jury very well might have concluded that the plaintiff and her husband had separated and that she might not receive very much in the future from his earnings had he lived."

This was unwarranted speculation on the part of both tribunals. Even assuming at the worst that the plaintiff and wife had been temporarily estranged, although the plaintiff strenuously denied this supposition at the trial, this assumption would not justify a jury, in a wholly different civil action, to decide that the husband would not have supported his wife. A husband has the legal and moral obligation to support his wife and he may not be excused from that obligation simply because he took some clothing to another place in town. In *DeSantis v. Maddalon,* 348 Pa. 296, 300, this Court, citing *Gentile v. Philadelphia & Reading Rwy.,* 274 Pa. 335, said: "A husband and father is presumed to perform the legal duty of supporting his wife and minor children; in any event, they are entitled to what the law would have compelled him to furnish them, whether he had previously done so or not."

The lower court said that the verdict was a compromise verdict. We do not believe it was a compromise verdict, and it certainly was not a compensatory verdict. It was what might be called a consolatory verdict, a verdict which damns with faint sympathy. The verdict was a patronizing verdict, one for which there is no warrant in our system of trial by jury. A jury is not to ladle out largess or throw out sops. It is to dispense justice and it must do so on facts and not on speculation; on reality and not on innuendo. The decedent and the plaintiff had been married 29 years, two children had been born of the marriage. The support that the wife would be entitled to, now that she had reached the age of 52 years, could

not be wiped out because of an assumption based on the meagerest of testimony which, in its manner of presentation, had no bearing on the issues in the litigation.

The lower court's assumption that the verdict was a compromise one was not based alone on the arbitrary hypothesis of a separation between the decedent and his wife. The trial court said that the weight of the evidence was with the defendant: "If one weighs the testimony of the plaintiff and the defendant, we have the inescapable conclusion that the preponderance of testimony is clearly with the defendant."

It then cited the case of *Carpenelli v. Scranton Bus Co.*, 350 Pa. 184, and quoted: "But when the evidence is equally divided in weight, or a fortiori, when the preponderance of testimony is clearly with the defendant and the verdict rendered for the plaintiff, while small, is substantial, the problem becomes one of an entirely different nature, for in such event it can no more reasonably be said that the plaintiff recovered too little than that he should not have recovered at all; therefore, in such a case it is just as likely, or more likely, that the granting of a new trial would constitute an act of injustice to the defendant rather than one of justice to the plaintiff."

Let us see whether the preponderance of the testimony is so clearly with the defendant as to bring into play the argument in the *Carpenelli* case. On the night of November 30, 1957, Robert Walbert attended a political meeting, following which he escorted two ladies to a restaurant where they enjoyed a snack and lingered in conversation. He then drove one of them to her parked car and proceeded to take the other, Mrs. Schleifenheimer, to her home on North 10th Street in Reading. Arrived in front of her house, he was backing up into a parking space when another car traveling in the same direction he was facing (north), struck the left side of his car, demolishing it and inflicting fatal injuries on him.

Mrs. Schleifenheimer testified that the front part of Walbert's car extended about 2 or 3 feet beyond the front end of the parked cars on the east side of the street. Walbert's car was stationary when the other car crashed into it. Walbert received a severe blow in the stomach and while in pain he said to Mrs. Schleifenheimer: "Oh, my stomach. Oh, Florence, that is a terrible feeling to see somebody come down at a terrific rate of speed and can't get out of his way." This utterance was admitted in evidence under the rule of res gestae.

North 10th Street is a one-way thoroughfare, pointing north. It was the contention of the defendant that he was proceeding north on the west side of that street and that the decedent came out in front of him. Walbert's car and debris resulting from the collision were on the east side of the street when the police arrived to investigate immediately the accident. Skid marks on the street led to the defendant's car, spelling out his path from behind the decedent's car and then to the point where it finally stopped. The condition of the decedent's car, with its whole left half torn away, spoke indubitably of great violence resulting from the application of tremendous speed. The decedent's shoes were whipped off his feet.

In addition to this evidence of the defendant's car being on his wrong side of the street, considering the parked cars which were in his path, there was evidence that the defendant was intoxicated. Three policemen, all completely disinterested in this litigation, testified to seeing the defendant after the accident and they described his unsteady gait, his bloodshot eyes, the odor of alcohol on his person, his belligerent attitude and uncooperativeness. They all testified that in their opinion he was under the influence of intoxicating liquor. W. A. Romanski, with 12 years' experience as a detective, testified that in his opinion the defendant was un-

der the influence of intoxicating liquor to the extent that "he was incapable of operating a motor vehicle."

Another impartial witness was E. L. Wise, who roomed in the house facing the scene of the accident. When he heard the crash he hastened into the street, observed the location of the cars and accompanied Mrs. Schleifenheimer and Farina to the hospital. He stated that at the hospital Farina was "wobbly or unsteady" and that, in his opinion, he was intoxicated.

The defendant himself admitted that he had been drinking that night. He was a bartender at the Hosiery Workers Club, and testified that he did not "keep track of the numbers of beers" he consumed the night of the accident, although at one time he said it was "maybe six or seven."

From all this inculpating evidence it is difficult to see why the trial court should have regarded the evidence so lopsidedly in favor of the defendant that the verdict had to be regarded as a compromise verdict. It is true the defendant testified, as we have stated, that he was on the west side of the street and that the decedent pulled out in front of him, and in this he was supported by another witness,[2] but the clash in testimony made out a case for the jury which, having once resolved the question of fact in favor of the plaintiff, should have allowed to her the full extent of the proved damages, and not have whittled it down with the knife of extraneous matters.

The trial court, in refusing the new trial, suggested that the decedent might have been guilty of contributory negligence. There was nothing in the plaintiff's case intimating contributory negligence. Then, there is always the presumption which, like a spirit, rises from a dead body to proclaim that the decedent wanted to live and therefore exercised due care.

---

[2] This witness was an officer of the club which the defendant served as a bartender.

During the trial defendant's counsel, in cross-examining one of the police officers, asked: "And you recall that after the hearing in Alderman Shapior's office Mr. Farina was indicted, tried, and acquitted in the charge of involuntary manslaughter?"

This question was highly improper and called for the withdrawal of a juror.[3] Not all jurors are aware of the difference in the measure of proof required for a conviction in a criminal case and that required for a verdict for the plaintiff in a civil case. It is highly possible that all the evidence presented at the civil trial with regard to the intoxication of the defendant evaporated in the light of the observation that the defendant had been acquitted in the criminal court, because, even though the question was not answered (as the result of an objection) it was clear from the way in which it was put, that an affirmative reply was inevitable. The trial judge was satisfied that no harm was done to the plaintiff by this question because he told the jury: "You will forget the last question." To tell a jury to forget a question which is vitally a part of the crucial issue before them is like asking them to forget that an important witness was a dwarf with a humped back.

The plaintiff complains that she was not allowed to show that there had been a prior consonant statement by a plaintiff witness and that she was not permitted to show a prior inconsistent statement of a defendant witness. The cases of *Risbon v. Cottom,* 387 Pa. 155 and *Bizich v. Sears,* 391 Pa. 640, are authorities for guidance in situations of the kinds indicated.

The plaintiff asks that a new trial be ordered and that it be limited to the question of damages. The record demands a new trial but it does not justify a new trial confined to the ascertainment of damages.

---

[3] *Shoup v. Mannino,* 188 Pa. Superior Ct. 457, *Patton v. Franc,* 404 Pa. 306.

Reversed with a venire facias de novo.

---

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

There was a substantial conflict in the evidence as to negligence and contributory negligence. Under these circumstances, the verdict of the jury was obviously a compromise verdict and I agree with the trial Judge and with the Superior Court that the weight of the evidence as to contributory negligence was with defendant, and that a new trial should be refused.

I would affirm the judgments on the opinion of Judge ERVIN of the Superior Court.